**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**GARLAND MURRAY,**

   **Plaintiff,**

**v.**                 **Civil Action No.** <u>2:18-cv-00942</u>

**ACTING WARDEN RALPH TERRY,
COMMISSIONER BETSY JIVEDEN,
OFFICER LILLY, WILLIAM SUMPTER,
DONALD SLACK, TONY RICHARDS,
JAMES SMITH, NATHAN WITHROW,
JESSE SMITH, CORPORAL TAYLOR,
LIEUTENANT HILL, SERGEANT WARD,
and JOHN DOE OFFICERS,**

   **Defendants.**

## <u>COMPLAINT</u>

  1.  This case arises from the excessive use of force and other retaliatory conduct against Plaintiff in response to his previous litigation against Mount Olive Correctional Complex (MOCC) and its employees. In the action at hand, without provocation, Defendants wrongfully used highly concentrated pepper spray against Plaintiff while he was locked alone in a holding cell presenting no threat to himself, others, or the facility. Defendants then brutally attacked Plaintiff, throwing him to the floor and punching and kicking him repeatedly while he was fully restrained. Defendants then moved Plaintiff to a sink, which they banged his head into, causing additional injury. Thereafter, Defendants deprived Plaintiff of a mattress or clothing—instead leaving it outside his cell door and taunting him, leaving him a cell with feces on the floor outside for extended periods, placed him in a cell without working water, and deprived him of regular meals, all while taunting him for having previously filed grievances and litigation. Defendants refused to timely photograph Plaintiffs' injuries and, while Defendants repeatedly

stated that the incidents had been videotaped and documented, they later recanted this story, stating that there no video documentation of the incidents existed or had been retained.

2.      Plaintiff Garland Murray, an individual incarcerated in the Mount Olive Correctional Complex (MOCC), a state penitentiary in Mount Olive, West Virginia, submits this Complaint, pursuant to 42 U.S.C. § 1983, alleging that his rights under the First and Eighth Amendment to the United States Constitution and under state law were violated. Mr. Murray seeks immediate transfer to a safe facility and other appropriate relief.

**PARTIES**

3.      Plaintiff Garland Murray is, and at all relevant times herein, was a citizen of the United States in the custody of the West Virginia Division of Corrections (WVDOC), located in Kanawha County, and incarcerated within MOCC. Mr. Murray is an African American man.

4.      Defendant Betsy Jividen is the Commissioner of the West Virginia Division of Corrections (WVDOC). As Commissioner of WVDOC, Defendant Jividen is vested with executive authority and responsibility for the administration, operation, and control of all WVDOC facilities and employees of WVDOC facilities, including MOCC. In this position, Defendant Jividen's duties include establishing, monitoring, and enforcing policy directives and procedures that ensure constitutional confinement and treatment of all people in the custody of the WVDOC. Defendant Jividen is also responsible for ensuring WVDOC facilities are safely staffed. Defendant Jividen is named in her official capacity for the purposes of seeking injunctive and declaratory relief.

5.      Defendant Ralph Terry is the Acting Warden of MOCC. In that capacity, Defendant Terry is tasked by law with the care and custody of Mr. Murray and all other prisoners incarcerated at MOCC. Defendant Terry is vested with executive authority and responsibility for

the safe staffing, administration, operation, and control of MOCC, including the oversight of all MOCC employees and the authority to promulgate, amend, and implement all policies and procedures within MOCC to ensure constitutional confinement and treatment of those individuals incarcerated within. Defendant Terry is named in his official capacity for the purposes of seeking injunctive and declaratory relief.

6.     Defendants Lilly, William Sumpter, Donald Slack, Tony Richards, James Smith, Nathan Withrow, Jesse Smith, Taylor, James Smith, and Hill were, at all relevant times herein, correctional officers employed at MOCC. At all times alleged herein, Defendants were acting under the color of law and within the apparent scope of their employment as correctional officers employed at MOCC. Said Defendants are sued in their individual capacities up to the limits of the insurance policy which provides liability coverage for their actions and inactions. Said Defendants are only sued in their official capacities for injunctive and declaratory relief.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the federal claims presented in this action pursuant to 28 U.S.C. §§ 1331, 1343 and under the Court's authority to decide pendent state law claims. Declaratory relief is authorized by 28 U.S.C. §§ 2201-2202.

8.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because all of the events that support the allegations occurred in this judicial district and because Mr. Murray is incarcerated in this judicial district.

## FACTUAL BACKGROUND

### Background

9.     In 2013, Mr. Murray filed litigation pro se regarding, *inter alia*, his stabbing and hospitalization and subsequent medical treatment while incarcerated in solitary confinement at

MOCC. As set forth in that litigation, Mr. Murray alleged that staff and supervisors at MOCC were aware that Mr. Murray was being targeted by white supremacist gang members, and nonetheless permitted him to be stabbed on the recreation yard. *See Murray v. Rubenstein, et al.*, Civil Action No. 2:13-cv-15798 (S.D.W. Va.)

10.     Ultimately, in 2017, the case was settled shortly before trial.

11.     In June 2017, Mr. Murray filed litigation pro se regarding his treatment while incarcerated in the segregation unit at MOCC, including regarding an incident in or around April 2017 in which he slipped on wet floor, sustained back and head injuries, and thereafter MOCC employees dragged him down metal stairs while he was fully handcuffed and shackled, and then left him in his own feces and urine. During this incident, MOCC employees used racial slurs against him. *See Murray v. Ballard, et al.*, Civil Action No. 2:17-cv-03261 (S.D.W. Va.). Defendant Smith is named in this litigation.

12.     After filing the 2017 litigation, Defendants Smith and Withrow have threatened Mr. Murray regarding his filing of lawsuits.[1]

**Mr. Murray Is Attacked By Defendants in Retaliation for Asserting His Legal Rights**

13.     On or around November 20, 2017, Mr. Murray was housing in the Stuart Hall Unit at MOCC.

14.     At or around 9:00 p.m., Defendants Lilly and Sumpter placed Mr. Murray in mechanical restraints (handcuffs and shackles) and escorted him to the control unit for a urine drug screening test.

---

[1] In addition to the threats and retaliation set forth herein, Mr. Murray has been denied a job while in general population, despite being compliant and free from disciplinary infraction for considerable periods of time. Defendants further continue to place Mr. Murray in a dorm for people with noted behavior problems, even though he was not displaying any behavioral problems.

15.     As of this date, Mr. Murray had passed multiple consecutive urine drug screening tests without issue.

16.     Mr. Murray explained that he could not urinate because he had recently urinated, as Defendants were aware.

17.     Mr. Murray was then locked in an empty, single cell in the control unit.

18.     Thereafter, Defendant Smith and other officers arrived at the control unit. Upon his arrival, Defendant Smith referred to Mr. Murray as "Mr. Lawsuit Man" and stated that he would "teach [Mr. Murray] today that lawsuits weren't shit."

19.     Mr. Murray repeatedly requested water to drink to enable him to urinate, but the officers ignored him.

20.     At some point thereafter, Mr. Murray knocked on the door to the cell that he was in and spoke to Defendant Richards. Defendant Richards advised Mr. Murray to knock on his door when he was ready for the urine test.

21.     Thereafter, Mr. Murray knocked on the door to request more water.

22.     In response, Defendant Smith came to the door with a water bottle and opened the slot in the door.

23.     When Mr. Murray leaned down to take the water, without providing any warning, direction, or command to Mr. Murray, Defendant Smith commenced spraying Mr. Murray in face and head with oleoresin capsicum (OC) spray through the slot in the door.

24.     At the time Defendant Smith deployed OC spray on him, Mr. Murray was fully compliant, was securely locked alone in a cell, and presented no immediate threat or risk to the safety of himself or others or to the property of MOCC.

25.     The OC used by Defendants is an extreme chemical agent. Upon information and belief, it contains active ingredients including oleoresin capsicum (OC) and major capsaicinoids that deliver a concentrated burst of pepper spray measuring around 2,000,000 on the Scoville Heat Unit (SHU).[2]

26.     Defendant Richards, the supervising officer on duty, did not make any efforts to intervene in the wrongful use of OC spray. Rather, he stood by and watched the excessive use of force.

27.     The other Defendant officers similarly stood by and watched the excessive use of force without intervening.

28.     Mr. Murray suffered severe burning sensations to his eyes, face, and body, as well as significantly restricted breathing, coughing, choking, and gasping for breath, as the result of the unwarranted and unjustified use of OC spray.

29.     Defendants Smith, Richards, Lilly, Sumpter, and Slack used or condoned the use of OC against Mr. Murray without first giving any order or otherwise making any effort to temper the force used against Mr. Murray. Mr. Murray did not resist or threaten the officers in any fashion or break any prison rules that threatened the security and good order of the facility. Indeed, Mr. Murray had not taken any action to justify Defendant Smith's completely unprovoked use of OC spray.

30.     Mr. Murray was then directed to "cuff up," which he did in a fully compliant manner, by placing his hands behind his back out of the bean hole slot in the door.

31.     Defendant Smith fastened handcuffs extremely tightly around Mr. Murray's wrists with his hands behind his back, causing him discomfort and pain. At this point, Defendant

---

[2] The SHU is a measurement of the heat, traditionally used to represent the spicy heat of peppers. As a point of comparison, the hottest pepper in the world, the Carolina Reaper, has a recorded SHU of approximately 1,569,300.

Smith was holding the chain between Mr. Murray's hands through the bean hole. Another officer then opened the door quickly with Mr. Murray's hands still through the slot in the door, causing Mr. Murray to fall forward, hanging from his arms through the bean hole.

32.     As soon as Mr. Murray attempted to right himself, officers including, upon information and belief, Defendants Smith, Lilly, Sumpter, and Slack, slammed Mr. Murray to the ground and piled on top of him while he was laying on his stomach with his hands cuffed behind his back. Defendants repeatedly punched Mr. Murray in his face and head and choked his throat while sitting and/or standing on top of his legs, arms, and back, and holding his head up to expose him to the punches.

33.     During the incident, Mr. Murray repeated several times that he was struggling to breathe.

34.     At all times during the assault, Mr. Murray's hands were cuffed behind his back.

35.     Mr. Murray did not resist the officers, was fully compliant, and presented no risk of harm to himself or others or to the safety and security of the facility.

36.     During the incident, Defendant Richards did not intervene or exercise his authority to stop the assault, and instead stood by purportedly videotaping the assault and thereby condoned the assault of Mr. Murray.

37.     Mr. Murray suffered immediate fear, anxiety, panic, chest pain, and pain to his arms, body, face, and head as the result of having been thrown to the floor, beaten, and choked by officers.

### Defendants Intentionally Prolong Mr. Murray's Suffering

38.     Mr. Murray was then roughly escorted to the medical unit.

39.     Mr. Murray was placed under a shower without being given an opportunity to remove his clothes; Defendants further did not provide him with soap. As a result, he was not able to meaningfully remove the OC from himself.

40.     Defendants then moved Mr. Murray to the recreation yard in the Quilliams II unit.

41.     Defendants then hit Mr. Murray's head against the sink multiple times, causing his permanently affixed dental grill—which should be securely attached to his teeth—to break and causing him extreme pain to his mouth and causing his lip to split open. Without the dental grill, Mr. Murray's teeth are extremely sensitive because the enamel was removed to create the grill.

42.     Defendants then they held Mr. Murray's head under hot water, which exacerbated the effects of the OC spray.

43.     Defendants held Mr. Murray's face under the hot water despite Mr. Murray's requests that Defendants stop doing so.

44.     No photographs were taken of Mr. Murray's injuries.

45.     Mr. Murray was then placed in a solitary confinement cell in Quilliams II, Cell 307, in his wet, contaminated clothing, without a mattress or any other items.

46.     The cell contained solely a metal bedframe, metal desk, metal sink, and metal toilet. The cell is 8' x 10' or eighty square feet. Cell doors are made of solid steel and contain a narrow slot, or "bean hole," through which food and medication is passed, or weapons deployed.

47.     At some time during the night after Mr. Murray was placed in the cell, Defendant Withrow, Defendant Slack, and Defendant John Doe carried a mattress to the cell door without opening it.

48.     Said Defendants laughed, asked Mr. Murray if he had learned his lesson, and left the mattress outside Mr. Murray's cell door while taunting him.

49.     Mr. Murray was left for the night with no mattress, soaking wet clothing, and burning skin as the result of the inadequate decontamination.

50.     At or around seven in the morning, when breakfast was being distributed, Mr. Murray begged for his mattress in tears, at which point he was provided the mattress.

51.     At this time, Mr. Murray was also provided dry t-shits and boxer shorts, but not any other clothing.

52.     Mr. Murray was also provided his dental grill, which had been knocked out.

53.     When Mr. Murray requested a full shower, he was advised that he would not be provided a shower for three days.

54.     The denial of a true shower caused Mr. Murray continued unnecessary pain and suffering, causing a rash and other skin irritation, as the result of the prolonged exposure to OC.

**Mr. Murray Suffers Injuries**

55.     Defendant Smith's unprovoked use of OC caused Mr. Murray to suffer severe burning sensations to his face and eyes, swelling of his eyelids, sinus pain, coughing, difficulty breathing, and generalized discomfort through gagging and choking on the chemical agent.

56.     Mr. Murray suffered significant pain and injuries as the result of the physical attack and beating, including to his eye socket, his eyes, knots and bruises on his forehead and sides of his head, swelling and splitting of his lips, blurred vision, swelling of eyes, burst blood vessels in his eyes, redness, bruising, swelling and abrasions to his wrists, and significant pain and restriction in his jaw making it difficult to eat.

57.     These injuries took significant time to heal.

58.     Moreover, because of Defendants' threatening conduct and excessive utilization of force, Mr. Murray has further suffered and continues to suffer intense panic, headaches, fear, anxiety, depression, and humiliation.

### Defendants Tacitly Admit the Force Was Unjustified

59.     Mr. Murray was not written up for any rule infraction related to the deployment of the OC spray.

60.     Further, Mr. Murray's write up regarding the take down and beating was dismissed in a disciplinary hearing.

### Defendants Attempt to Cover Up Their Conduct

61.     Thereafter, Mr. Murray requested repeatedly that photographs be taken of his injuries.

62.     In response, Mr. Murray was advised that Sergeant Ward, the supervising officer, had denied the request for photographs.

63.     Photographs were not taken of Mr. Murray's injuries until November 30, 2017, ten days after the incident, and after Mr. Murray's visible injuries had significantly decreased.

64.     When Mr. Murray asked why photographs had not been previously taken, he was not provided any reason.

65.     Further, on or about November 20, 2017, Mr. Murray requested that the video evidence of the attack be preserved.

66.     Mr. Murray was advised on or about December 1, 2017, that "All video footage is saved and attached to the use of force reports and to the use of force review. This video can be obtained through a subpoena."

67. On December 11, 2017, Mr. Murray was advised, "there was a video taken the night you were placed in lock-up which documented the medical assessment and your visible injuries."

68. On December 27, 2017, Mr. Murray was advised that the incident was "well-documented."

69. However, by letter dated January 18, 2018, the Central Office Grievance Review, Division of Corrections, related:

> Please be advised that right after the incident in question, the Warden's office attempted to review the available video footage of the incident and found that the camera's video disks had not recorded properly and were blank. In as much as the grievance responses indicate the existence of recorded video of the incident, the responses are in error.

## Continued and Ongoing Harassment and Retaliation

70. Mr. Murray has continued to suffer ongoing harassment and retaliation.

71. In or about late January 2018, Mr. Murray was again placed in solitary confinement.

72. At this time, employees of MOCC including Defendant Withrow and Defendant Jesse Smith publicized to other inmates Mr. Murray's grievances and requests for protective custody and other statements that he feared for his life and safety.

73. As anticipated, inmates then retaliated against Mr. Murray, including by throwing feces outside of his cell door.

74. MOCC's correctional officers failed and refused to clean up said feces, thus creating appalling and unlivable conditions for Mr. Murray.

75.     Further, while in solitary confinement, Mr. Murray was allotted solely *up to* one hour per day of time out of his cell to make calls to counsel, family, or shower. The pile of feces outside his door made it impossible for him to partake in these basic necessities.

76.     After repeated complaints over the course of several days, on or around January 31, 2018, Mr. Murray was moved to another cell in a pod that did not house the inmates at issue.

77.     While locked in solitary confinement, Mr. Murray had no access to any drinking water other than through his sink. The sink was also the only way that Mr. Murray could brush his teeth or wash himself, other than showers provided every three days.

78.     Mr. Murray was not provided drinking water for days. Instead, his new cell did not have potable running water and only released a rust-green substance from his sink.

79.     Mr. Murray repeatedly requested that he be provided potable water and that his sink be fixed, at least daily, including to Sergeant Jesse Smith, Corporal Taylor, and Lieutenant Hill.

80.     Nonetheless, said Defendants took no action.

81.     During this time period, Mr. Murray survived solely by drinking water from his toilet.

82.     Defendants refused to provide Mr. Murray with potable water for nearly two weeks until on or around February 12, 2018.

83.     At this time, Mr. Murray was advised that the pipes had been corroded and were broken.

84.     Thereafter, on more than one occasion, Corporal Withrow deprived Mr. Murray of his meals by dumping out his trays on the concrete floor.

85.     In response to his requests for food, Corporals Withrow and Taylor taunted him and suggested that he violate prison policy to instigate a use of force against him, including a suggestion by Corporal Withrow that Mr. Murray kick his door, which is against prison policy, and said that he would "bounce [Mr. Murray's] head off the ground like the other COs did," among other threats.

86.     When Mr. Murray requested that the videos of these incidents captured by cameras mounted on the wall be retained, he was advised each time, first, that his attorney could subpoena the footage and, second, that "We do not retain video at inmates' requests," indicating that the video could not actually be obtained through subpoena.

87.     As the result of the these conditions, Mr. Murray suffered harm, including hunger, thirst, dehydration, dizziness, headaches, nausea, rashes, loss of sleep, anxiety, depression, fear, and other psychological injury.

## Exhaustion of Administrative Remedies

88.     Mr. Murray has exhausted his administrative remedies with respect to all claims.

## CLAIMS FOR RELIEF

## COUNT I
## VIOLATIONS OF THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION (EXCESSIVE FORCE)
## (42 U.S.C. § 1983)

89.     Mr. Murray incorporates and re-alleges, by reference, the allegations of the previous paragraphs of this complaint.

90.     Defendants, while acting under the color of law, violated Mr. Murray's Eighth Amendment right against cruel and unusual punishment, resulting in Plaintiff's pain and suffering.

13

91.     Defendants violated Mr. Murray's federal constitutional right, as described and identified herein, by authorizing, committing, condoning, or failing to remedy the excessive and wrongful force, employed without efforts to temper, without provocation, and without justification against Mr. Murray on or about November 20, 2017, and by prolonging his suffering thereafter as described herein.

92.     The policies, procedures, practices, and actions of the Defendants were in violation of clearly established law.

93.     The Eighth Amendment to the United States Constitution forbids cruel and unusual punishment and prohibits deliberate indifference to excessive uses of force that are unnecessary, unjustified, or applied with malicious and sadistic intent for the purpose of punishment and to cause harm.

94.     On November 20, 2017, it was clearly established that the use of mace, tear gas, or other chemical agents "in quantities greater than necessary or for the sole purpose of infliction of pain" violated the Eighth Amendment of the United States Constitution. *See Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008). It was further clearly established that the assault as described herein violated the Eighth Amendment of the United States Constitution.

95.     By using nontrivial physical force, against Mr. Murray without need or to cause pain, condoning the use of such force, or failing to intervene to prevent the use of such force, Defendants James Smith, Slack, Lilly, Sumpter, and Richards violated the Eighth Amendment.

96.     By using force as described above without efforts to temper the severity of the force and for no justifiable reason, Defendants Smith, Slack, Lilly, and Sumpter applied nontrivial force against Mr. Murray that was excessive, unnecessary, and unreasonable, or for the purpose of wantonly causing harm and punishment to Mr. Murray.

97.    By failing to intervene to prevent the excessive use of force, Defendant Richards proximately caused nontrivial force to be used against Mr. Murray in an excessive, unnecessary, unreasonable, and wanton manner or for the purpose of causing harm and punishment to Mr. Murray.

98.    There was no good-faith need for the application of force, given that Mr. Murray was fully compliance; was locked inside his cell; did not resist any order; and made no verbal or physical threat to his own safety, the safety of the officers and staff, other inmates, property, or the security and good order of the facility.

99.    The relationship between the need for force and the amount of force used was excessive. In fact, no amount of force against Mr. Murray was necessary, given that he was locked inside his cell; did not break any prison rule nor resist any order; and was not a threat to his own safety, the safety of the officers and staff, other inmates, property, or the security and good order of the facility.

100.    Defendants could not reasonably perceive Mr. Murray, who was compliant, passive, and safely secured in his cell, to be a threat at the time they committed, condoned, or failed to intervene in the excessive use of force against him.

101.    No efforts were made to temper the severity of the force used against Mr. Murray.

102.    The Defendants' conduct conflicts with WVDOC Policy Directive #312.02, which clearly establishes guidelines concerning the appropriate use of physical, less-lethal force, including OC pepper spray, by division personnel.

103.    Defendants also violated WVDOC Policy Directive #332.00, which is in place to ensure "that appropriate procedure and practice protects inmates from personal abuse, corporal punishment, personal injury, . . ., and harassment." Specifically, WVDOC Policy Directive

#332.00 states that "[i]n situations where physical force or disciplinary detention is required, only the least drastic means necessary to secure order or control shall be used."

104.    Here, no physical force or disciplinary detention was required against Mr. Murray, much less the force described above.

105.    The actions of the Defendants were committed under the color of state law, unreasonable, excessive, and deprived Mr. Murray of his clearly established constitutional rights to safety and not to be subjected to cruel and unusual punishment of which a reasonable correctional officer should have known pursuant to the Eighth Amendment to the United States Constitution, as well as rules provided by WVDOC Policy Directives, and the WVDOC Corrections Academy training materials.

106.    As a direct or proximate result of the Defendants' unconstitutional actions or inactions, by which Mr. Murray was subjected to unnecessary and excessive force in violation of the Eighth Amendment to the United States Constitution, Mr. Murray seeks to recover damages that compensate him for:

        A.    Physical pain and suffering, past and future;

        B.    Mental pain and suffering, past and future;

        C.    Humiliation, embarrassment, and degradation; and

        D.    All other injuries proven by a preponderance of evidence proximately caused by the Defendants.

107.    In addition to these compensatory fees, Mr. Murray also seeks to recover, under 42 U.S.C. § 1988, the attorneys' fees and costs incurred during the course of this litigation.

108.    Mr. Murray additionally requests that this Court issue a declaratory judgment stating that the excessive and unnecessary abuse of Mr. Murray on November 20, 2017, violated his rights under the Eighth Amendment to the United States Constitution.

109.    To ensure his own protection, Mr. Murray requests that this Court issue an injunction ordering the immediate transfer of Mr. Murray to a different WVDOC facility.

110.    To ensure the protection of all inmates who are or will be confined at MOCC, Mr. Murray requests that this Court issue an injunction ordering Defendants' to cease all unconstitutional policies and practices currently in effect at MOCC.

111.    In a further effort to protect himself and prevent similarly situated individuals from suffering the same violation of their constitutional rights, Mr. Murray also seeks to have the Court order Defendants as well as the other correctional officers and administrators employed by MOCC to: (1) undergo additional training and education addressing such uses of excessive and wrongful force, (2) develop clear policies to preclude such illegal actions from occurring in the future, (3) develop procedures to ensure that reviews are ordered into all claims of excessive force and performed without bias by people qualified to determine whether the force violated the constitution, (4) and implement disciplinary measures and counseling against Defendants and others who similarly use wrongful and excessive force so that they are held accountable for their wrongful actions and may learn how to correct their behaviors.

112.    The actions or inactions of Defendants against Mr. Murray were reprehensible, willful and wanton, malicious, and in blatant and intentional disregard of the rights owed to Mr. Murray, thereby justifying an award of punitive damages, to the extent that such damages are covered by Defendants' applicable insurance coverage.

## COUNT II
## VIOLATIONS OF THE EIGTH AMENDMENT OF THE UNITED STATES
## CONSTITUTION (PHYSICAL CONDITIONS OF CONFINEMENT)
## (42 U.S.C. § 1983)

113.    Mr. Murray incorporates and re-alleges, by reference, the allegations of the previous paragraphs of this complaint.

114.    Defendants Slack, Withrow, Jesse Smith, Taylor, and Hill, while acting under the color of law, violated Mr. Murray's Eighth Amendment right against cruel and unusual punishment by denying him the minimal civilized measure of life's necessities, resulting in Plaintiff's pain and suffering.

115.    As described herein, Plaintiff suffered a serious deprivation of basic human necessities, including sanitary living conditions not contaminated by feces, access to clean water for drinking and washing, access to bedding and clothing, and access to food.

116.    Defendants Slack, Withrow, Jesse Smith, Taylor, and Hill, were deliberately indifferent to Plaintiff's health, safety, and other basic needs as described herein, having been repeatedly notified of such conditions and deliberately taking no action to remedy them in a timely or appropriate manner.

117.    The actions of the Defendants were in violation of clearly established law.

118.    The Eighth Amendment to the United States Constitution forbids cruel and unusual punishment.

119.    During the time period at issue, it was clearly established that the serious deprivation of basic human needs as described herein violated the Eighth Amendment of the United States Constitution. *See, e.g.*, *Williams v. Griffin*, 952 F.2d 820 (1991); *Walker v. Schult*, 717 F.3d 119 (2d Cir. 2013).

120.     Plaintiff suffered harm as the result of the serious deprivation of basic human needs described herein, including hunger, thirst, dehydration, dizziness, headaches, nausea, rashes, loss of sleep, anxiety, depression, fear, and other psychological injury.

121.     The actions of the Defendants were committed under the color of state law, unreasonable, deliberate, and deprived Mr. Murray of his clearly established constitutional rights to not to be subjected to cruel and unusual punishment of which a reasonable correctional officer should have known pursuant to the Eighth Amendment to the United States Constitution, as well as rules provided by WVDOC Policy Directives, and the WVDOC Corrections Academy training materials.

122.     As a direct or proximate result of the Defendants' unconstitutional actions or inactions in violation of the Eighth Amendment to the United States Constitution, Mr. Murray seeks to recover damages that compensate him for:

    A.     Physical pain and suffering, past and future;

    B.     Mental pain and suffering, past and future;

    C.     Humiliation, embarrassment, and degradation; and

    D.     All other injuries proven by a preponderance of evidence proximately caused by the Defendants.

123.     In addition to these compensatory fees, Mr. Murray also seeks to recover, under 42 U.S.C. § 1988, the attorneys' fees and costs incurred during the course of this litigation.

124.     Mr. Murray additionally requests that this Court issue a declaratory judgment stating that conditions as set forth herein violated his rights under the Eighth Amendment to the United States Constitution.

125.    To ensure his own protection, Mr. Murray requests that this Court issue an injunction ordering the immediate transfer of Mr. Murray to a different WVDOC facility.

126.    To ensure the protection of all inmates who are or will be confined at MOCC, Mr. Murray requests that this Court issue an injunction ordering Defendants' to cease all unconstitutional policies and practices currently in effect at MOCC.

127.    In a further effort to protect himself and prevent similarly situated individuals from suffering the same violation of their constitutional rights, Mr. Murray also seeks to have the Court order Defendants as well as the other correctional officers and administrators employed by MOCC to: (1) undergo additional training and education, (2) develop clear policies to preclude such illegal actions from occurring in the future, and (3) implement disciplinary measures and counseling against Defendants and others who engage in the behavior at issue so that they are held accountable for their wrongful actions and may learn how to correct their behaviors.

128.    The actions or inactions of Defendants against Mr. Murray were reprehensible, willful and wanton, malicious, and in blatant and intentional disregard of the rights owed to Mr. Murray, thereby justifying an award of punitive damages, to the extent that such damages are covered by Defendants' applicable insurance coverage.

## COUNT III
## VIOLATIONS OF THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION (RETALIATION)
### (42 U.S.C. § 1983)

129.    Mr. Murray incorporates and re-alleges, by reference, the allegations of the previous paragraphs of this complaint.

130.    Defendants herein, while acting under the color of law, violated Mr. Murray's right to be free from retaliation for exercising his First Amendment right to file litigation and grievances against prison officials.

131.    Specifically, as set forth above, Defendants retaliated against Plaintiff by assaulting and battering him, threatening him, and depriving him of the minimum basic human necessities.

132.    During the time period at issue, it was clearly established that an inmate's First Amendment right to petition is violated when he is retaliated against for filing a grievance or lawsuit. *See, e.g.*, *Booker v. S. Carolina Dept. of Corrs.*, 855 F.3d 533 (2017).

133.    Plaintiff suffered harm as the result of the retaliation, including physical pain, bruising, swelling, abrasions, damage to his teeth, loss of sleep, thirst, dehydration, headaches, nausea, rashes, hunger, anxiety, depression, fear, and other psychological injury.

134.    As a direct or proximate result of the Defendants' unconstitutional actions or inactions, by which Mr. Murray was subjected to retaliation for exercising his First Amendment right to petition the government, Mr. Murray seeks to recover damages that compensate him for:

        A.    Physical pain and suffering, past and future;

        B.    Mental pain and suffering, past and future;

        C.    Humiliation, embarrassment, and degradation; and

        D.    All other injuries proven by a preponderance of evidence proximately caused by the Defendants.

135.    In addition to these compensatory fees, Mr. Murray also seeks to recover, under 42 U.S.C. § 1988, the attorneys' fees and costs incurred during the course of this litigation.

136.    To ensure his own protection from ongoing retaliation, Mr. Murray requests that this Court issue an injunction ordering the immediate transfer of Mr. Murray to a different WVDOC facility.

137.    To ensure the protection of all inmates who are or will be confined at MOCC, Mr. Murray requests that this Court issue an injunction ordering Defendants' to cease all unconstitutional policies and practices currently in effect at MOCC.

138.    In a further effort to protect himself and prevent similarly situated individuals from suffering the same violation of their constitutional rights, Mr. Murray also seeks to have the Court order Defendants as well as the other correctional officers and administrators employed by MOCC to: (1) undergo additional training and education, (2) develop clear policies to preclude such illegal actions from occurring in the future, and (3) implement disciplinary measures and counseling against Defendants and others who engage in the behavior at issue so that they are held accountable for their wrongful actions and may learn how to correct their behaviors.

139.    The actions or inactions of Defendants against Mr. Murray were reprehensible, willful and wanton, malicious, and in blatant and intentional disregard of the rights owed to Mr. Murray, thereby justifying an award of punitive damages, to the extent that such damages are covered by Defendants' applicable insurance coverage.

## COUNT IV
## ASSAULT AND BATTERY

140.    Mr. Murray incorporates and re-alleges, by reference, the allegations of the previous paragraphs of this complaint.

141.    By making no efforts to temper and directly threatening the use of force against Mr. Murray, Defendants Smith and Withrow intended to create an apprehension within Mr. Murray of immediate physical harm.

142.    As a result of said Defendants' un-tempered and threatening conduct, Mr. Murray felt threatened and was put in imminent apprehension of being harmed.

143.     Defendants Smith, Lilly, Slack, and Sumpter intentionally battered Mr. Murray as described above.

144.     As a direct result of being battered, Mr. Murray suffered injuries.

145.     In addition to the physical injuries caused by Defendants Withrow, Smith, Lilly, Slack, and Sumpter's assault and battery of Mr. Murray, Mr. Murray has suffered multiple forms of mental anguish, including but not limited to, fear, nightmares, anxiety, embarrassment, humiliation, and depression.

146.     Defendants are liable for their inappropriate conduct and the use of excessive force.

147.     As a direct and/or proximate result of Defendants' assault and battery, Mr. Murray seeks to recover damages to compensate him for:

A.     Physical pain and suffering, past and future;

B.     Mental pain and suffering, past and future;

C.     Humiliation, embarrassment, and degradation; and

D.     All other injuries proven by a preponderance of evidence proximately     caused by the defendants.

148.     The actions or inactions of Defendants against Mr. Murray were reprehensible, willful and wanton, malicious, and in blatant and intentional disregard of the rights owed to Mr. Murray, thereby justifying an award of punitive damages.

**COUNT V**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

149.     Mr. Murray incorporates and re-alleges, by reference, the allegations of the previous paragraphs of this complaint.

150.    All named Defendants herein intentionally or recklessly conducted themselves in an extreme and outrageous manner by assaulting Mr. Murray; retaliating against Mr. Murray; threatening Mr. Murray; causing Mr. Murray to be left without basic necessities, including requiring him to drink from his toilet and withholding meals from him; and destroying evidence without just cause and in violation of law, as described herein.

151.    Defendants knew or should have known that such conduct was reasonably certain to cause Mr. Murray severe emotional distress as well as physical harm.

152.    Despite this knowledge, Defendants intentionally or recklessly utilized extreme and outrageous conduct against Mr. Murray.

153.    Defendants' intentional, extreme and outrageous conduct against Mr. Murray caused Mr. Murray to suffer bodily injury, as well as severe emotional distress and mental distress, including but not limited to, fear, nightmares, anxiety, embarrassment, humiliation, depression, and loss of personal dignity.

154.    As a direct and proximate result of such outrageous conduct, Mr. Murray seeks to recover damages to compensate him for:

A.    Physical pain and suffering, past and future;

B.    Mental pain and suffering, past and future;

C.    Past and future medical bills;

D.    Humiliation, embarrassment, and degradation; and

E.    All other injuries proven by a preponderance of evidence proximately      caused by the defendants.

155.    The actions or inactions of Defendants against Mr. Murray were reprehensible, willful and wanton, malicious, and in blatant and intentional disregard of the rights owed to Mr. Murray, thereby justifying an award of punitive damages.

## COUNT VI
## NEGLIGENCE

156.    Mr. Murray incorporates and re-alleges, by reference, the allegations of the previous paragraphs of this complaint.

157.    Defendants Slack, Withrow, Jesse Smith, Taylor, and Hill were negligent when they failed to correct Mr. Murray's conditions of confinement and/or affirmatively placed Mr. Murray in unsafe and unsanitary living conditions, including unsanitary living conditions contaminated by feces, no access to clean water for drinking and washing, no access to bedding and clothing, and deprivation of food at mealtimes.

158.    These Defendants had a duty to ensure Mr. Murray's safety and well-being.

159.    The Defendants negligently caused an unsafe environment as set forth herein.

160.    The negligence was the proximate cause of Plaintiff's physical and emotional injuries.

161.    As a direct and/or proximate result of Defendants' negligence, Mr. Murray seeks to recover damages to compensate him for:

A.    Physical pain and suffering, past and future;

B.    Mental pain and suffering, past and future;

C.    Humiliation, embarrassment, and degradation; and

D.    All other injuries proven by a preponderance of evidence proximately caused by the defendants.

25

162.     The actions or inactions of Defendants against Mr. Murray were reprehensible, willful and wanton, malicious, and in blatant and intentional disregard of the rights owed to Mr. Murray, thereby justifying an award of punitive damages, to the extent that such damages are covered by Defendants' applicable insurance coverage.

## COUNT VII
## SPOLIATION

163.     Plaintiff incorporates the preceding paragraphs by reference.

164.     At the time that Defendants Lilly, Sumpter, Smith, Richards, Slack took or should have taken video recorded and photographic evidence, and preserved said evidence, a potential civil action existed.

165.     Defendants had actual knowledge of the potential civil action.

166.     Defendants had a duty to preserve video and photographic evidence of the attack on or about November 20, 2017, and of the conditions of Plaintiff's confinement thereafter.

167.     Defendants spoliated said evidence by failing and/or refusing to record said evidence, and/or destroying said evidence.

168.     The spoliated evidence was vital to Plaintiff's ability to prevail in this civil action.

169.     Plaintiff is injured by the spoliation of said evidence, which would have clearly established the factual basis of his claims.

170.     The actions or inactions of Defendants against Mr. Murray were reprehensible, willful and wanton, malicious, and in blatant and intentional disregard of the rights owed to Mr. Murray, thereby justifying an award of punitive damages, to the extent that such damages are covered by Defendants' applicable insurance coverage.

## PRAYER

**WHEREFORE**, based on the above stated facts, Plaintiff Garland Murray respectfully requests that this Honorable Court award all damages, including attorneys' fees and costs, to Mr. Murray to compensate him for the injuries he suffered as the direct and/or proximate result of Defendants' actions. Mr. Murray also seeks an award of punitive damages to deter other similarly situated correctional officers from committing similar acts. Finally, Mr. Murray seeks whatever equitable relief the Court deems appropriate, such as but not limited to, the injunctive relief requested above.

Respectfully submitted,

**Plaintiff,**
**GARLAND MURRAY,**
**By Counsel,**

/s/ Jennifer S. Wagner
Jennifer S. Wagner (WV Bar # 10639)
Mountain State Justice, Inc.
325 Willey Street
Clarksburg, WV 26505
(304) 326-0188
(304) 326-0189 (facsimile)